# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CROSS CHARTERING N.V., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-04-2264 |
| | § | |
| R.I.P.C. (TRINIDAD) LIMITED, *et al.,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION ON MOTIONS FOR
## SUMMARY JUDGMENT AND SETTING OUT FINDINGS
## AND CONCLUSIONS FOLLOWING BENCH TRIAL

This admiralty suit arises from contract disputes over payments for cargo shipments on two vessels, the M/V K TOPAZ and M/V GANGGA NAGARA. Plaintiff, Cross Chartering, N.V., the vessel charter, sued R.I.P.C. (Trinidad) Ltd., another vessel charter, and the cargo owners, Bredero Shaw LLC and ShawCor Pipe Protection LLC, alleging that money for the shipments remains owing. The ShawCor entities have moved for summary judgment dismissing the claims. (Docket Entry Nos. 56, 57). Cross Chartering responded to both motions, (Docket Entry Nos. 64, 66, 77), and the ShawCor parties replied, (Docket Entry Nos. 80, 81). After reviewing the motions and responses, the pleadings, the record, and the controlling law, this court grants the ShawCor parties' motion for summary judgment, finding no liability as to the cargo shipment on M/V K TOPAZ. This court denied the ShawCor parties' motion for summary judgment as to the claims arising from the cargo shipment on the M/V GANGGA NAGARA, finding disputed fact issues. This court held a

bench trial to resolve those fact issues on October 10, 2005.  Based on the testimony and arguments presented in the bench trial, as well as the undisputed facts shown by the summary judgment evidence, this court enters findings of fact and conclusions of law.  Based on those findings and conclusions, the ShawCor parties have no liability for the claims arising out of the M/V GANGGA NAGARA shipment, and the counterclaims provide no basis for recovery.

The basis for these rulings is addressed below.

## I.    The Parties and the Contracts

Plaintiff, Cross Chartering, N.V., is a business entity organized under the laws of Belgium, with its principal place of business in Antwerp.  The director and founder of Cross Chartering is Christophe Thienpont.

Cross Chartering is an operator involved in chartering vessels and locating third parties who want to ship various cargoes on the vessels.  Cross Chartering also provides door-to-door shipping services.  This broader service includes loading the cargo, organizing the voyage, paying for bunkers and port charges, and arranging for supervising and discharging cargo.  Cross Chartering does not own the vessels involved or employ the crew. Cross Chartering is instead a non-vessel owning common carrier.  (Docket Entry No. 58, Ex. D at 53–54).

R.I.P.C. (Trinidad) Ltd. is a business entity organized and existing under the laws of the Republic of Trinidad and Tobago.  Steven Reynolds served as the principal for R.I.P.C. (Trinidad) throughout the relevant period.

Third-party defendant R.I.P.C., Inc. is a corporation organized and existing under the laws of the State of Oklahoma, with an office located in Houston, Texas.

Bredero Shaw LLC and ShawCor Pipe Protection LLC (together, "ShawCor" or the "ShawCor parties") are business entities under the laws of the State of Texas, with an office and principal place of business located in Houston, Texas.  Bredero Shaw specializes in coating and insulation systems for corrosion protection on land and marine pipelines. ShawCor Pipe Protection supplies products and services for the oil and gas industry.  In early 2004, ShawCor wanted to ship approximately 40,000 metric tons of iron ore from San Vincente, Chile to La Brea, Trinidad.

Third-party defendant A&R Shipping Ltd. is a limited liability company organized and existing under the laws of the State of Oklahoma, with an office located in Houston, Texas.

Steven Reynolds is the CEO and President of R.I.P.C., Inc., and the Chairman of the Board for both R.I.P.C. (Trinidad) and R.I.P.C., Inc.  R.I.P.C., Inc. arranges and coordinates ocean, air and inland transportation for project cargo.  Reynolds has a history of bad business dealings and has been convicted on two counts of felony embezzlement.

A&R Shipping is a project freight transportation company that arranges and coordinates ocean, air, and inland transportation for cargo.

Peter Mohamed is a director of A&R Shipping; he resides in Trinidad.  Mohamed served as a director of R.I.P.C. (Trinidad) from its inception until his resignation on May 28, 2004.

Cross Chartering and Steven Reynolds/R.I.P.C. worked together beginning in 1994. The history between Cross Chartering and Reynolds/R.I.P.C. includes the chartering and shipment of cargo on the following vessels:  SILVER EXPRESS, BIOBIO, CONDOR ARROW, SEA BIRD, THORNDALE, SCAN FALCON, ARTESE MEADOW, GANGGA NAGARA, K TOPAZ, and EXPLORIOS.  Throughout their business relationship, Thienpont at Cross Chartering and Reynolds at R.I.P.C. had an oral agreement to divide profits equally. (Docket Entry No. 58, Ex. D at 52–53).  In their transactions before the shipments at issue, R.I.P.C. established the business contacts with the shipping clients, executed the commercial contract, collected money due from the client, and paid the expenses associated with operations in the discharge port.  Cross Chartering chartered the ship, arranged port captains, coordinated load and discharge operations, and oversaw accounting for the projects.  Cross Chartering would submit invoices to R.I.P.C., which would then invoice the clients for payment.  (*Id.*).

By the fall of 2003, Thienpont had loaned Reynolds over $1 million, purportedly to fund investments.  As part of a plan to repay Thienpont, Reynolds introduced Thienpont to the ShawCor representatives in the hopes of setting up a shipping contract that would financially benefit R.I.P.C. and Cross Chartering.  It is undisputed that on September 25, 2003, Jim Horn, head of procurement for ShawCor, and Noel Corcoran, general manager of ShawCor, met with Reynolds and Thienpont to discuss shipping approximately 40,000 metric tons of iron ore from Chile to Trinidad in early 2004.  (Docket Entry No. 58, Ex. D at 58–62).  According to Thienpont, the purpose of the meeting was for R.I.P.C. and Cross

Chartering to show ShawCor that R.I.P.C. and Cross Chartering were acting together, and for Reynolds to show Thienpont that this was a *bona fide* business opportunity.  (Docket Entry No. 58, Ex. D at 61–62).  Thienpont had no discussions with anyone at ShawCor after the September 2003 meeting.  (*Id.* at 61).  Reynolds/R.I.P.C. served as the communication intermediary between Cross Chartering/R.I.P.C. and ShawCor.

After the September 2003 meeting, ShawCor requested a quote from R.I.P.C. for the shipment of iron ore from Chile to Trinidad on a per ton basis.  The parties agreed that Cross Chartering/R.I.P.C. would transport the iron ore for ShawCor.  Consistent with previous ventures, Cross Chartering was to handle the ocean transportation, chartering the ships and arranging loading and discharging operations.  R.I.P.C. was to handle its usual responsibilities of negotiating and executing the contracts, preparing the invoices, paying the appropriate fees and local expenses, and collecting payment.  Cross Chartering did not invoice ShawCor directly for shipment.  Instead, Cross Chartering invoiced R.I.P.C., which invoiced ShawCor.  (Docket Entry No. 58, Ex. D at 88, 90–102; Exs. 12–13).  Thienpont and Reynolds agreed that Cross Chartering and R.I.P.C. would split the profits from the ShawCor shipments on an equal basis.  (Docket Entry No. 58, Ex. D at 53, 58–62, 73–78).

Reynolds and various ShawCor representatives exchanged numerous communications about the shipments over the two months after the initial agreement.  During this period, R.I.P.C. and ShawCor learned that the size and depth of the dock at the La Brea, Trinidad port could not accommodate a vessel with the amount of iron ore ShawCor wanted delivered.  (Docket Entry No. 58, Ex. D at 59–60, 97–101).  The parties determined that lighters would

have to be used to carry the iron ore cargo from the vessel to the dockside,[1] when the cargo would then be loaded onto trucks for inland carriage.  R.I.P.C. arranged for the lighters.  In exchange for these services, ShawCor agreed to pay an additional $7.70 per metric ton over R.I.P.C.'s initial quote of $20.00 per metric ton for the carriage of the cargo from Chile to Trinidad.  In addition, R.I.P.C. undertook to handle the inland trucking and stockpiling of the cargo, for an additional $2.00 per metric ton.  (Docket Entry No. 57, Exs. D–E).

On or about December 16, 2003, the parties had reached an agreement for the shipment of a minimum of 20,000 metric tons of iron ore from Chile to Trinidad for a total price of $29.70 per metric ton, broken down as follows:

> Sea freight: $13.00 per metric ton
>
> Lightering: $7.70 per metric ton
>
> Stevedoring: $7.00 per metric ton
>
> Trucking and stockpile: $2.00 per metric ton.

(Docket Entry No. 57, Ex. D).

Over the course of the next two weeks, Cross Chartering and R.I.P.C. attempted to charter a vessel to carry the first iron ore shipment from Chile.  This shipment needed to reach Trinidad by February 1, 2004.  Cross Chartering and R.I.P.C. had overestimated their ability to charter a vessel at a low enough daily rate to turn a profit on the voyage.  On December 30, 2003, R.I.P.C. sent an email to ShawCor stating that, as a result of a substantial increase in the vessel chartering market, the costs for sea freight alone would be

---

[1] Large flat-bottomed barges called "lighters" are used for transporting cargo to or from a vessel that cannot be berthed at a pier or dock.

$38.00 per metric ton for the first shipment ($25.00 per metric ton above the quoted price). (Docket Entry No. 57, Ex. F; Docket Entry No. 58, Exs. 12–14).  R.I.P.C. suggested that ShawCor would have to make up for the loss that Cross Chartering and R.I.P.C. would sustain on the first shipment.  This was ShawCor's first notice that Cross Chartering and R.I.P.C. had run into difficulties finding a vessel for the first shipment.

As a result of R.I.P.C.'s December 30, 2003 email, a meeting was held between Reynolds of R.I.P.C. and various representatives of ShawCor on January 2, 2004 in Houston, Texas.  At the meeting, the ShawCor representatives explained that they expected R.I.P.C. and Cross Chartering to honor their contractual obligations by carrying the iron ore from Chile to Trinidad for the agreed price of $29.70 per metric ton (including the original rate of $13.00 per metric ton for sea freight).  ShawCor offered to take R.I.P.C.'s request for the higher sea freight rate to their client.  The client similarly refused to agree to a higher rate. On January 3, 2004, ShawCor issued amended purchase orders to R.I.P.C. on which the sea freight rate was stated as $13.00 per metric ton.  R.I.P.C. forwarded invoices to ShawCor on January 3, 14, and 18, all showing a sea freight rate of $13.00 per metric ton.  (Docket Entry No. 57, Exs. D–E).

Late on January 2, 2004, Thienpont at Cross Chartering sent Reynolds at R.I.P.C. an email that set out a fixture recap of the terms of Cross Chartering's charter agreement with the owners of the vessel to be nominated for the first shipment.  (Docket Entry No. 57, Ex. F).  The email noted that Cross Chartering and R.I.P.C. would be charging ShawCor a sea freight rate of $38.00 per metric ton.  (*Id.*).  In the email, Cross Chartering asked R.I.P.C. to

7

forward the recap to ShawCor for signature.  (*Id.*).  ShawCor did not sign this recap and asserts that it never received or saw the email.

On January 6, 2004, following further communications between ShawCor and R.I.P.C., Cross Chartering nominated the M/V GANGGA NAGARA for the first iron ore shipment.  The M/V GANGGA NAGARA proceeded to Chile and arrived at its load berth on January 12, 2004.  The crew loaded the cargo without incident and the vessel departed on January 15, 2004.  On January 27, 2004, R.I.P.C. invoiced ShawCor for $25.00 per metric ton (a total of $591,038.28) in additional sea freight charges.  (Docket Entry No. 58, Ex. F).  ShawCor rejected the invoice as contrary to the parties' agreement and to the amended purchase orders ShawCor had issued on January 3, 2004.  The M/V GANGGA NAGARA arrived at Trinidad on January 30, 2004.  (Docket Entry No. 58, Exs. 5–6).  In response to ShawCor's rejection of the January 27, 2004 invoice, R.I.P.C. and Cross Chartering initially threatened not to release the cargo for discharge.  As of January 27, 2004, ShawCor had paid all money due except the $591,038.28 newly demanded by R.I.P.C.  The ShawCor parties continued to reject requests to pay the additional $25.00 per metric ton charge.  R.I.P.C. and Cross Chartering eventually allowed the cargo to be discharged at Trinidad, leaving the demand for the higher sea freight amount unresolved.  (Docket Entry No. 15, Exs. 12–13).

In this case, Cross Chartering submitted an email purporting to be sent from ShawCor to R.I.P.C., dated January 30, 2004.  In that email, Noel Corcoran of Bredero Shaw purportedly confirmed ShawCor's agreement to the terms of the fixture recap and unconditionally promised to pay the additional sea freight rate of $25.00 per metric ton.

(Docket Entry No. 57, Ex. 3).  Reynolds at R.I.P.C. faxed this purported email to Thienpont at Cross Chartering after Thienpont expressed concern over ShawCor's refusal to pay the higher sea freight rate.  (Docket Entry No. 58, Ex. D at 122–37; Exs. 12–14).  In this purported email, ShawCor agreed to "irrevocably undertake to pay R.I.P.C. Trinidad, LTD. no later than the end of the day Tuesday, February 4, 2004, the outstanding amounts of sea freight in the amount of $591,038.28."  (Docket Entry No. 57, Ex. 3).  Cross Chartering asserts that Noel Corcoran, general manager of Bredero Shaw, agreed with the contents of the email at an April 19, 2004 meeting held in Trinidad.  That meeting was attended by Corcoran, Montano, Reynolds, Mohamed, and others.  The evidence as to what occurred at that meeting was disputed.  ShawCor adamantly denied that: (1) a balance of $591,038.28 is outstanding for sea freight; (2) it ever entered into any agreement for the higher sea freight rate; and (3) that Corcoran ever sent the email to Reynolds at R.I.P.C. (Trinidad) and/or R.I.P.C.  The parties presented witnesses testifying about that meeting at the bench trial held on October 10, 2005.

In this case, Cross Chartering also relies on the bill of lading issued for the first cargo shipment and subsequently forwarded to ShawCor.  In particular, Cross Chartering relies on the statement in the bill of lading that freight was payable "as per charter party dated January 2."  (Docket Entry No. 57, Ex. G).  Cross Chartering argues that this is a reference to the fixture recap contained in the email from Cross Chartering to R.I.P.C., an email ShawCor contends it never received.  ShawCor contends that this reference in the bill of lading cannot form the basis of the dramatic increase in the sea freight rate.  ShawCor argues that there was

no January 2 charter party and points to additional communications between ShawCor and

R.I.P.C. after January 2, 2004 that are consistent with the original price.

For the second shipment of iron ore, Cross Chartering selected the M/V K TOPAZ.

Hoping to avoid the confusion that surrounded the M/V GANGGA NAGARA shipment,

Cross Chartering sought a more specific contract for this second shipment. The relevant

disputed provision of the contract, entitled "Payment Conditions," reads as follows:

> 1)
> 70% of USD7.70 pmton [per metric ton] plus VAT immediately upon confirmation of vessel fixture into R.I.P.C. account.
>
> 2)
> USD 20 pmton immediately upon confirmation of vessel fixture into Cross account with value date 3 march [sic] 2004.
> USD 12 pmton within 24 hrs [sic] of completion of loading and prior to s/r Ba/1
> Both above to be paid directly into Cross Chartering account with Dexia Bank:
>
> DEXIA Bank – Meir 85 – 2000 Antwerp
> Swift: ARTE BE AE ANY
> Iban: BE 55 5513 99880044
> Credit Account: 551-3998800-44
> Favour: Cross Chartering N.V.
>          Hapoleankaad 39 – E 2000 Antwerpen
>
> 3)
> Balance 30 pct of USD 7.7 pmton lightening on commencement of discharge in la Brea.
> 4)USD 2 pmton on completion of stockpile.
> 5) R.I.P.C. and ShawCor agree to pursue a change order for an additional US$ 7 per metric ton on this shipment with NGC at earliest possible convenience.
>
> ShawCor Pipe Protection LLC to affect the 2 down payments immediately under paragraphs (1) and (2) on our reconfirmation and request of their bankers to send an irrevocable fax confirmation of payment.

> If the first payments do not reach R.I.P.C./Cross accounts within 24 hours of fixture R.I.P.C./Cross has the right to cancel the charter with owners and all expenses for ShawCor Pipe Protection LLC account.
>
> The above terms are fixed and agreed to and subject only to reconfirmation the vessel is open
>
> And fixed by R.I.P.C./Cross which is to be reconfirmed by R.I.P.C./Cross latest within 1 hours after signing this document.
>
> Houston, 2/3/2004

(Docket Entry No. 57, Ex. 2). The complete contract is signed by Jim Horn on behalf of ShawCor Pipe Protection LLC, Christophe Thienpont on behalf of Cross Chartering, and Steven Reynolds on behalf of R.I.P.C. (Trinidad) LLC. (*Id.*).

The contract set a total price per metric ton of $32.00. ShawCor ultimately shipped 41,302 metric tons of iron ore. (Docket Entry No. 57, Ex. G). Based on the total tonnage, the contract amount due was $1,321,664.00. R.I.P.C. invoiced ShawCor $820,000.00 for the first of two payments. (Docket Entry No. 58, Ex. 22). As directed by the invoice, which was consistent with the contract, ShawCor made the first payment of $802,000.00 via wire transfer to Dexia Bank on or about March 3, 2004. Cross Chartering does not dispute that it received this wire transfer.

On or about March 10, 2004, ShawCor received an invoice from R.I.P.C. Trinidad directing it to pay the remaining amount – $501,664.00 – not to Cross Chartering's Dexia bank account, but instead to a R.I.P.C. bank account at JP Morgan Chase Bank. (*Id.*, Ex. G). As it had done with the first payment, ShawCor paid under the invoice, this time to the JP Morgan Chase Bank account. Cross Chartering claims that it never received this money.

R.I.P.C. has defaulted in this case. Steven Reynolds was subpoenaed but was not served and did not appear.

## II.    The Applicable Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.* The nonmovant must "do more than simply show that there is some metaphysical doubt as

to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

"A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004) (citing *Foster Wheeler Energy Corp. v. AN NING JIANG MV*, 383 F.3d 349, 354 (5th Cir. 2004); *Capozziello v. Brasileiro*, 443 F.2d 1155, 1159 (2d Cir. 1971)). "[A] freely negotiated private international agreement, unaffected by fraud, undue influence, or overwhelming bargaining power . . . should be given full effect." *Foster Wheeler Energy Corp.*, 383 F.3d at 354–55 (quoting *M/S BREMEN v. Zapata Off-Shore Co.*, 407 U.S. 1, 12–13 (1972))

(additional citations omitted).  "A contract is construed against the drafting party only when it is ambiguous."  *Chembulk Trading LLC*, 393 F.3d at 555 n.6 (citing *Empire Fire & Marine Ins. Co. v. Brantley Trucking, Inc.*, 220 F.3d 679, 681 (5th Cir. 2000)).  A contract is not ambiguous if "its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation."  *Id.*

### B.    Charter Parties

A charter party is a type of contract.  The rules and principles of construction for commercial contracts generally apply.  *See Marine Overseas Servs., Inc. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1234 (5th Cir. 1986).  A charter comes into existence when the parties have a meeting of the minds on the essential terms.  *E.A.S.T., Inc. of Stamford, Conn. v. M/V ALAIA*, 673 F. Supp. 796, 799 (E.D. La. 1987) (citing *Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*, 523 F.2d 527, 534 (2d Cir. 1997)), *aff'd*, 876 F.2d 1168 (5th Cir. 1989).  The parties need not sign the charter to make it legally binding.  *Valero Refining, Inc. v. M/T Laubenhorn*, 813 F.2d 60, 64 (5th Cir. 1987); *St. Paul Fire & Marine Ins. Co. v. Vest Transp. Co.*, 666 F.2d 932, 939 (5th Cir. 1982).  Once the standard contract requirements, such as consideration and capacity, have been satisfied, a court presumes the formation of a charter, even if some specifics have not been decided.  *See E. Marine Corp. v. Fukaya Trading Co.*, 364 F.2d 80, 84 (5th Cir. 1966).

"Charter parties are formed in two stages."  *P.E.P. Shipping (Scandinavia) APS v. Noramco Shipping Corp.*, 1997  AMC 2933, *2 (E.D. La. 1997) (Clement, J.) (citing *Great Circle Ines, LTD. v. Matheson & Co., Ltd.*, 681 F.2d 121, 124 (2d Cir. 1982)).  The first stage

involves the negotiation of the "main" terms, such as the name of the charterer, name of the owner, ship and the ship's characteristics, time and place of delivery, duration of the charter, place of redelivery, and other terms the parties consider important. *Id.* Once the parties' communications evidence agreement on the charter's main terms, a "fixture" is reached. *U.S. Titan, Inc. v. Guangzhou Zhen Shipping*, 241 F.3d 135 (2d Cir. 2001). A fixture is binding and enforceable only when the parties have agreed to its essential terms. *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527 (2d Cir. 1997).

Once a fixture is reached, the second stage of negotiations begins. The parties negotiate the details of the less-important elements of the voyage, such as the fuel to be used, vessel speed, brokerage, option to extend charter, cargo capacity, and other information the parties consider "minor." *P.E.P. Shipping (Scandinavia) APS*, 1997 A.M.C. 2933 at *2. A fixture is binding even though it remains "subject to details," that is, even if there is not yet a meeting of the minds on the less important terms of the complete agreement. *Id.* (citing *Matter of Arbitration Between Herlofson Mgmt. A/D and Ministry of Supply, Kingdom of Jordan*, 765 F. Supp. 78, 79 n.1 (S.D.N.Y. 1991)). Even if the parties fail to agree on the "details" of the voyage, the charter party governs. *Id.*

### C.    Agency

The law of agency applies to admiralty cases. *See Archer v. Trans/American Servs., Ltd.*, 834 F.2d 1570 (11th Cir. 1988); *Port Ship Serv., Inc. v. Int'l Ship Mgmt. & Agencies Serv., Inc.*, 800 F.2d 1418, 1420–21 (5th Cir. 1986) ("All parties agree that general agency law applies to these cases.") (citing *W. India Indus. v. Vance & Sons AMC-Jeep*, 671 F.2d

1384, 1387 (5th Cir. 1982)); Thomas J. Schoenbaum, 1 ADMIRALTY AND MARITIME LAW (4th ed. 2004) § 4.1 n.9.  The Fifth Circuit looks to the RESTATEMENT (SECOND) OF AGENCY as the source of the general agency law to be applied in admiralty cases.  *See Astral Int'l Shipping Servs., Inc.*, 800 F.2d at 1420 (citing *Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 275–76 (5th Cir. 1980)).  "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."  RESTATEMENT (SECOND) OF AGENCY § 1(1).  "Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him."  *Id.* at § 7.  "Manifestation of consent means conduct from which, in light of the giving of consent to the performance of an act may be the only reasonable inference, or it may be one of several reasonable inferences."  *Id.* at § 7 cmt. b.

An agent's authority may be express, implied, or apparent.  *Id.* at § 7 cmt. c.  "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."  *Id.* at § 8.  The law of express and implied authority governs relations between a principal and its agent.  The law of apparent authority governs relations between a principal and agent on the one hand and a third party on the other.  If apparent authority exists, the third party "has the same rights with reference to the principal as where the agent is authorized."  *Id.* at § 8 cmt. a.  "[A]pparent authority exists only with regard to those who believe and have reason to believe

that there is authority; there can be no apparent authority created by an undisclosed principal." *Id.* "Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the agent to be authorized." *Id.* at § 8 cmt. c. "The term 'apparent authority' has been broadly used by the courts to describe the power which agents have in creating liability against their principals, although without authority." *Id.* at § 8 cmt. f.

In determining whether apparent authority exists, courts may look to a wide array of conduct. Apparent authority may be conferred "by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him." *Id.* at § 27. "Thus, either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief." *Id.* at § 27 cmt. a. Such imputed knowledge can be broad. For example, "a person who permits another to do an act in such a way as to establish in a community a reputation for having authority to act, either by directing the agent so to represent, or by directing him to act and doing nothing to prevent the spread of such information by the agent or by others, creates apparent authority with respect to those who learn of the reputation. Third persons who are aware of what a continuously employed agent has done are normally entitled to believe that he will continue to have such authority for at least a limited period in the future, and this apparent authority continues until the third person has been notified or learns facts which should lead him to believe that the agent is no longer authorized." *Id.* A

stranger to the "community" cannot have apparent authority.  The third persons must have direct knowledge about the agent on which they reasonably rely.  *Id.* at § 27 cmt. b.  As to third parties who know that the agent *has* authority, but do not know the *extent* of that authority, the agent has apparent authority to perform tasks that another agent in that same position normally and customarily performs.  *Id.* at § 27 cmt. d.

In interpreting the extent of an agent's authority, a court looks to "the situation of the parties, their relations to one another, and the business in which they are engaged," including the parties' course of dealing.  *Id.* at § 34.  The agent's authority extends to incidental acts.  *See id.* at § 35; *see also id.* at § 36 ("Unless otherwise agreed, an agent is authorized to comply with relevant usages of business if the principal that usages of such a nature may exist.").

In interpreting apparent authority courts apply the same rules that apply to express or implied authority, with two exceptions.  *Id.* at § 49.  First, "manifestations of the principal to the other party to the transaction are interpreted in light of what the *other party* knows or should know[,] instead of what the *agent* knows or should know."  *Id.* at § 49(a) (emphasis added).  Second, "if there is a latent ambiguity in the manifestations of the principal for which he is not at fault, the interpretation of apparent authority is based on the facts known to the principal."  *Id.* at § 49(b).

### III.   Findings of Fact and Conclusions of Law as to the Shipment on the M/V GANGGA NAGARA

#### A.   Findings of Fact

Cross Chartering and R.I.P.C. agreed to arrange the transport of iron ore from Chile to Trinidad.  ShawCor initially agreed to pay a total of $20.00 per metric ton and later agreed to pay an extra $9.70 per metric ton (raising the total to $29.70) because the dock in Trinidad did not meet the expected specifications.  Within the total price, the parties' agreement established the sea freight rate at $13.00 per ton.  The shipment was to occur in late January 2004.

The parties dispute whether ShawCor later agreed to pay an additional $25.00 per metric ton for sea freight.  Cross Chartering primarily relies on an email purportedly authored by Noel Corcoran of Bredero Shaw and sent to R.I.P.C., which Reynolds at R.I.P.C. faxed to Thienpont at Cross Chartering.  In this purported email, dated January 30, 2004, Bredero Shaw "irrevocably undertake[s] to pay R.I.P.C. Trinidad, LTD. no later than the end of the day Tuesday, February 4, 2004, the outstanding amounts of sea freight in the amount of $591,038.28."  (Docket Entry No. 58, Ex. 14).  ShawCor contends that this email is fraudulent.  Fact issues material to determining whether this purported email was legitimate made summary judgment inappropriate.  The bench trial provided the evidence necessary to resolve this issue.

Late on January 2, 2004, Cross Chartering sent R.I.P.C. an email that contained a fixture recap of the terms of Cross Chartering's charter agreement with the owners of the vessel to be nominated for the first shipment.  The email noted that Cross Chartering and

R.I.P.C. would be charging ShawCor sea freight for moving the cargo from Chile to Trinidad at a rate of $38.00 per metric ton.  In the email, Cross Chartering asked R.I.P.C. to forward the recap to ShawCor for signature.  This court finds that the recap was never presented to, received by, signed or in any way agreed to by ShawCor.

The ShawCor witnesses credibly testified that no such email was ever sent to R.I.P.C. The fact that Cross Chartering received the email by fax, and not by electronic forward, further undermines the authenticity of the purported email.  The formatting on the purported email does not match that of the other emails in the record.  Based on this evidence and the credible testimony of the ShawCor witnesses, this court finds that ShawCor did not send R.I.P.C. the email that Reynolds faxed to Thienpont.  It is fraudulent.

Cross Chartering asserts that Noel Corcoran, general manager of Bredero Shaw, admitted and agreed to the contents of the email at an April 19, 2004 meeting held in Trinidad.  That meeting was attended by Corcoran, Montano, Reynolds, Mohamed, and others.  Mohamed testified during the bench trial that at the meeting, Corcoran admitted that Bredero Shaw agreed to the higher freight rate, as stated in the email.  At the time of the meeting, Mohamed was a director of R.I.P.C. (Trinidad) and acting on Reynolds's behalf. Mohammad testified that he had no prior knowledge of the meeting or what it concerned. He attended only by happenstance.  Reynolds had asked Mohamed for a ride to the office. When they arrived at the office, Reynolds asked Mohamad to sit in on the meeting. Mohamed had virtually no knowledge of the parties involved, the transaction, or the prior communications.  Despite his ignorance of the nature and purpose of the meeting — he was

literally "along for the ride" — Mohamad testified that Corcoran admitted that the ShawCor parties agreed to the higher sea freight price in the meeting.  Mohamed's testimony was not credible.

By contrast, the ShawCor witnesses gave credible accounts about the meeting. Corcoran credibly denied receiving, reading, or admitting to the contents of the purported email.  Garvin Simonette, a Trinidad attorney and United Kingdom barrister who assisted ShawCor in securing the release of the cargo from the La Brea port, credibly testified that Corcoran made no such admission at the meeting and that the purported email was neither read aloud nor circulated during the meeting.  Lee Evans, vice-president of ShawCor, and James Warner, who works in international procurement for ShawCor, both credibly testified that no email or other agreement to pay a sea freight rate of $38.00 per metric ton ever existed.

Based on the credibility determinations of the witnesses and the lack of indicia of reliability as to the email, this court rejects Cross Chartering's claim that ShawCor received, read, or agreed to the contents or terms of the purported January 30, 2004 email, either orally or in writing.

Cross Chartering further relies on the bill of lading issued for the cargo and forwarded to ShawCor.  In particular, Cross Chartering relies on a statement in the bill of lading that freight was payable "as per charter party dated January 2."  Cross Chartering argues that this is a reference to the fixture recap contained in the email from Cross Chartering to R.I.P.C. The email containing the fixture recap is dated January 3, 2004 (Belgium time) and was

received by R.I.P.C. in the late afternoon or early evening of January 2 (U.S. Central Standard Time).  As previously noted, ShawCor never received, agreed to, or signed the fixture recap.  This court finds that no charter party dated January 2, 2004 existed between Cross Chartering, R.I.P.C. and/or ShawCor.  The only other charter party in existence, the charter party between Cross Chartering and the owners of the M/V GANGGA NAGARA, is dated January 3, 2004.  The reference to the bill of lading for a charter party dated January 2 is meaningless.  This court finds that no contract or agreement existed between Cross Chartering/R.I.P.C., and ShawCor other than as stated in the ShawCor amended purchase orders of January 3, 2004.

With respect to the shipments aboard the M/V GANGGA NAGARA, Cross Chartering/R.I.P.C. followed their common practice.  Cross Chartering invoiced R.I.P.C., which then sent an invoice to ShawCor.  The invoices provided varying instructions requiring payments to accounts in Belgium, Trinidad, and Houston, depending on the circumstances. The relevant contract terms governing the M/V GANGGA NAGARA dispute are construed from the ShawCor Purchase Orders (TR01-00002-03; TR01-00003-03; and TR01-00021-03) in connection with the shipment of approximately 20,000 metric tons.

On January 18, 2004, Reynolds sent invoice number GN011504 to ShawCor for Purchase Order number TR01-00021-03 dated January 3, 2003.  The total amount allegedly due was $435,293.69.  The invoice included the following payment instructions:

Please effect an immediate wire transfer or deposit in full to:

Republic Bank Limited (Promenade Center)
Independence Square

Port of Spain, Trinidad
Phone:  888-625-2711
Attention:  Ms. Rebecca Khan

For credit to:                    Account # 00021 306 7999
Beneficiary:                     R.I.P.C. (Trinidad) Ltd.
Reference invoice #:          GN-011504 M/V Gangga Nagara

On January 27, 2004, Reynolds sent invoice number GNagara270104 to ShawCor for

"Additional Ocean Freight and Additional Charges Due and Payable on the M/V Gangga

Nagara."   The total amount listed as due was $591,038.28.   The invoice included the

following payment instructions:

Please ensure the monies and paid to:

R.I.P.C. (Trinidad) Ltd.
Promenade Center
Independence Square
Port of Spain, Trinidad
Attention:  Ms. Rebecca Khan

Account #:  02 13 06 7870

Monies must be received prior to discharge of the above vessel
commencing.

On January 31, 2004, Reynolds sent invoice number GN0310104 to ShawCor for

Purchase Order number TR01-00021-03 dated January 3, 2003.  The total amount allegedly

due for port charges of $4.00 per metric ton and value added tax was $100,124.52.   The

invoice included the following payment instructions:

Please effect an immediate wire transfer or deposit in full to:

Republic Bank Limited
(Promenade Center)
Independence Square

23

Port of Spain, Trinidad
Attention:  Ms. Rebecca Khan

Account #:  02 130 67870
Beneficiary:  R.I.P.C. (Trinidad) Ltd.
Reference invoice #:

On January 31, 2004, Reynolds sent invoice number GN0310104A to ShawCor for

Purchase Order number TRO-00021-03 dated January 3, 2003.  The total amount allegedly

due for stockpiling of iron ore was $52,062.26.  The invoice included the following payment

instructions:

Please effect an immediate wire transfer or deposit in full to:

Republic Bank Limited
(Promenade Center)
Independence Square
Port of Spain, Trinidad
Attention:  Ms. Rebecca Khan

Account #:  02 130 67870
Beneficiary:  R.I.P.C. (Trinidad) Ltd.
Reference invoice #:

On January 31, 2004, Reynolds sent a facsimile to ShawCor requesting an "Urgent

Wire" transfer of the $100,124.52 for the $4.00 per metric ton be wired that same day

according to the following payment instructions:

JP Morgan Chase Bank
Houston Region
712 Main Street
Houston, Texas  77002

Swift:  TCBKUS44
Routing Number:  113000609

For credit to account number:

160605185965
Steven Reynolds
R.I.P.C., Inc. Inc.
546 Villa Dr.
Seabrook, Tx  77586

ShawCor was not sent and did not receive any invoices relating to the M/V GANGGA

NAGARA shipment other than those set out above.  ShawCor made wire transfers and/or

deposits into the accounts identified on the invoices for all payments due under the relevant

purchase orders for the M/V GANGGA NAGARA shipment.  ShawCor has no remaining

contractual obligation arising from the iron ore shipment on the M/V GANGGA NAGARA.

### B.    Conclusions of Law

The law relating to admiralty contracts applies.  *See generally M/S BREMEN*, 407

U.S. at 12–13; *Chembulk Trading LLC*, 393 F.3d at 555; *Foster Wheeler Energy Corp.*, 383

F.3d at 354; *Nat'l Union Fire Ins. Co.*, 915 F.2d at 989 *Capozziello*, 443 F.2d at 1159.  Cross

Chartering has failed to establish the existence of a valid contract obligating ShawCor to pay

an additional $25.00 per metric ton for sea freight.  Cross Chartering's own testimony

establishes that there is no written contract between Cross Chartering and the ShawCor

parties.  Cross Chartering admits that ShawCor was not a party to the January 3, 2004 time

charter party for the M/V GANGGA NAGARA between Cross Chartering and the owners

of the vessel, Progress Bulk Carriers.  The email Cross Chartering forwarded to R.I.P.C. on

January 3, 2004 is not a valid fixture recap binding on, or enforceable against, ShawCor.

Cross Chartering admits that it does not know whether R.I.P.C. sent this email to ShawCor.

Although the email asked R.I.P.C. to obtain ShawCor's signature to the fixture recap,

ShawCor did not sign the alleged fixture recap.  The ShawCor purchase orders of January 3, 2004 and the R.I.P.C. invoices dated January 3, 14, and 18, 2004, after the dates of the alleged fixture recap, all state that the agreed rate for sea freight was $13.00 per metric ton, not the higher rate Cross Chartering seeks.  It was not until late January 2004 that R.I.P.C. sent an invoice for the alleged additional $25.00 per metric ton for sea freight.  This attempt to change the agreed price did not occur until after the cargo had been loaded on board the vessel and was ineffective.

A fixture is a meeting of the minds evidenced by the parties' communications on the significant main terms of a charter.  *U.S. Titan, Inc. v. Guangzhou Zhen Shipping*, 241 F.3d 135 (2d Cir. 2001).  A fixture comes into being and is binding and enforceable only when the parties have agreed to its essential terms.  *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527 (2d Cir. 1997).  There was no meeting of the minds or agreement by ShawCor to the essential terms of the fixture recap contained in Cross Chartering's email dated January 3, 2004.  *Cf. P.E.P. Shipping (Scandinavia) APS v. Noramco Shipping Corp.*, 1997  AMC 2933 (E.D. La. 1997).  The only valid contractual agreement between Cross Chartering and the ShawCor parties is evidenced by the ShawCor purchase orders and corresponding R.I.P.C. invoices.  These documents reflect an agreement for the carriage of 23,000 metric tons of iron ore from Chile to Trinidad for $29.70 per metric ton, including a sea freight rate of $13.00 per metric ton.  It is undisputed that under this agreement, ShawCor paid $262,960.60.  ShawCor did not breach the contract.

Cross Chartering has also asserted that ShawCor's acceptance of the bill of lading covering the shipment of cargo dated January 15, 2004, which states that freight was payable per "charter party dated 2 January 2004," binds ShawCor to paying an additional $25.00 per metric ton for the cargo shipped aboard the M/V GANGGA NAGARA.  This argument is without merit.  There was no 2 January 2004 charter party.  Cross Chartering admits that the reference in the bill of lading to the 2 January 2004 charter party was to the January 3 email from Cross Chartering to its business partner, R.I.P.C., containing proposed fixture terms and asking that R.I.P.C. obtain ShawCor's signature indicating its agreement to the proposed freight rates.  ShawCor did not accept these terms and did not sign the email containing the fixture recap.  These proposed terms were not incorporated into the bill of lading so as to become binding on ShawCor.[2]

Cross Chartering's breach of contract claim with respect to the shipment of cargo aboard the M/V GANGGA NAGARA fails.[3]

## IV.    The Shipment on the M/V K TOPAZ

Cross Chartering asserts that ShawCor breached its contract by sending payment for the second invoice to the R.I.P.C. bank account designated in the invoice instead of wiring it to the Cross Chartering bank account designated in the contract.  ShawCor responds with

---

[2]  Even if the email from Cross Chartering to R.I.P.C. of January 3, 2004, could somehow be considered a charter party, it was not incorporated into the bill of lading because the bill of lading does not identify the charter party by the correct date nor the parties to the charter party.  *See Son Shipping Co. v. DeFosse & Tangag*, 199 F.2d 687 (2d Cir. 1952); *Fed'l Ins. Co. v. M/V AUDACIA*, 1987 AMC 556 (S.D.N.Y. 1986).

[3]  To the extent that any of the findings of fact is a conclusion of law, it should be considered a conclusion of law.  To the extent any of the conclusions of law is a finding of fact, it should be considered as a finding of fact.

several arguments.  First, ShawCor claims that the contract was ambiguous as to the payment instructions and should be construed against the drafters, Cross Chartering and R.I.P.C. Second, ShawCor contends that because Cross Chartering and R.I.P.C. were partners in the transaction, making payment to one partner (R.I.P.C.) constitutes payment to the other (Cross Chartering).  Finally, ShawCor argues that Reynolds acted as Cross Chartering's actual or apparent agent when he changed the payment instructions.  Under this theory, ShawCor asserts that Reynolds had the actual or apparent authority to change the terms of the agreement governing the means of payment.  It is undisputed that in the second invoice, Reynolds directed ShawCor to send the payment to a different bank account than the account shown in the contract.  ShawCor asserts that because it acted in conformity with this amended contract, it did not breach the contract by sending the money to the specified bank account and is not obligated to pay a second time.

To support the claim that the contract is ambiguous, ShawCor argues that it lacked sufficient clarity as to which bank account, R.I.P.C.'s or Cross Chartering's, should receive the money paid under the contract.  ShawCor relies on other provisions that make references to "R.I.P.C./Cross" to support this argument.  The contract provisions about payment were not ambiguous.  The contract included five numbered provisions under the heading, "Payment Conditions."  Provision 1 stated that ShawCor must direct 70 percent of the total ($7.70 per metric ton), plus value-added tax, directly to R.I.P.C. upon confirmation of the vessel; provision 2 stated that payments of $20.00 per metric ton (due immediately) and an additional $12.00 per metric ton (due within twenty-four hours of loading) were to be paid

to a specified Cross Chartering bank account.  (Docket Entry No. 57, Ex. 2).  The fact that other parts of the contract referred to "R.I.P.C./Cross" or similar abbreviations does not make this part of the contract ambiguous.  Indeed, Bredero Shaw had no problem following provision 2 with regard to the first payment.[4]  As specifically directed by the unambiguous contract, Bredero Shaw wired $820,000.00 to the Cross Chartering bank account identified in the contract provision. There is no ambiguity that would justify construing the contract provisions against Cross Chartering.  *Cf. Chembulk Trading LLC*, 393 F.3d at 555 n.6; *Nat'l Union Fire Ins. Co.*, 915 F.2d at 989.

ShawCor followed the unambiguous contract terms and the first invoice from R.I.P.C. in sending the first payment to Cross Chartering's account.  For the second payment, however, Bredero Shaw sent the payment to a different bank account, as directed by a second invoice sent by Reynolds at R.I.P.C.  The parties dispute whether the invoice ShawCor received validly amended the payment instruction provisions of the contract.

The parties do not dispute that Thienpont/Cross Chartering and Reynolds/R.I.P.C. acted as partners in this shipping contract.  Consistent with their prior practices, Reynolds had sole responsibility for all billings and communications with clients.  Reynolds/R.I.P.C. invoiced ShawCor for both payments that the contract required ShawCor to make.  (Docket Entry No. 57, Ex. G; Docket Entry No. 58, Ex. 22).  The second invoice, however, directed payment to a bank account different from the one specified in the contract.  (Docket Entry No. 58, Ex. 22).  The issue whether Reynolds had the apparent authority to change the

---

[4]   As discussed below, R.I.P.C. also sent ShawCor an invoice directing payment to the Cross Chartering account listed in the contract.  (Docket Entry No. 58, Ex. G).

payment instruction provisions of the contract depends on the information that Cross Chartering conveyed to ShawCor about Reynolds.

The only time Thienpont met with ShawCor representatives was on September 25, 2003. (Docket Entry No. 58, Ex. D at 57–61). Reynolds set up the meeting. (*Id.* at 61). At that meeting, it was clear that Reynolds was acting on behalf of both R.I.P.C. and Cross Chartering. After the meeting, Reynolds handled all further discussions and negotiations with ShawCor and ultimately drafted and executed the relevant contracts and agreements. Thienpont testified at his deposition that he followed his usual practice in dealing with Reynolds at R.I.P.C. Cross Chartering invoiced R.I.P.C.; R.I.P.C. invoiced the customer, ShawCor; the customer paid R.I.P.C.; and then R.I.P.C. paid Cross Chartering. (Docket Entry No. 57, Ex. A at 153). Thienpont admitted that, as with the M/V GANGGA NAGARA, R.I.P.C. did all the invoicing for the M/V K TOPAZ on behalf of R.I.P.C. and Cross Chartering. ShawCor paid R.I.P.C., not Cross Chartering, and R.I.P.C. promised to pay Cross Chartering in turn. (*Id.*; Docket Entry No. 58, Exs. 12, 22). Even when Thienpont had problems or questions about ShawCor's positions, he relayed them entirely through Reynolds. (Docket Entry No. 58, Ex. 13). Thienpont/Cross Chartering never contacted ShawCor directly. ShawCor in turn negotiated and communicated only with Reynolds. In the M/K TOPAZ shipment — the second large transaction involving Cross Chartering, R.I.P.C., and ShawCor within a short period — Reynolds at R.I.P.C. was the sole source of communications with ShawCor on behalf of Cross Chartering and R.I.P.C.

ShawCor received and paid invoices received from R.I.P.C. signed by Reynolds throughout this period.  The record contains invoices dated as early as December 18, 2003. (Docket Entry No. 58, Ex. F).  The first invoice for the M/V K TOPAZ shipment issued on February 27, 2004.  (*Id.*).  R.I.P.C./Reynolds issued several invoices to ShawCor at this time. (*Id.*; Docket Entry No. 57, Ex. G; Docket Entry No. 58, Exs. 12, 22).  The record contains no evidence that Cross Chartering ever asked Reynolds to stop invoicing ShawCor on its behalf, or informed ShawCor that Reynolds/R.I.P.C. lacked authority to invoice and collect payment on its behalf.  Instead, Reynolds/R.I.P.C. continued to act as the agent for Thienpont/Cross Chartering.

Thienpont had numerous conversations and exchanged email correspondence about payments with Reynolds.  Thienpont conceded that no one from ShawCor was involved in or aware of any of these exchanges.  (Docket Entry No. 57, Ex. A at 160–61).  The documentary evidence submitted with the summary judgment motions is consistent: Thienpont/Cross Chartering communicated only with Reynolds, and only Reynolds communicated with ShawCor.  (*See, e,g.*, Docket Entry No. 58, Exs. 18–21 (email correspondence between Thienpont and Reynolds regarding the M/V K TOPAZ, including draft contracts, and correspondence between Reynolds and representatives of the ShawCor parties)).  Cross Chartering/Thienpont permitted Reynolds to maintain his position as the only communicator with ShawCor on Cross Chartering's behalf.  (*Id.*).

Despite the fact that the second payment never reached Cross Chartering's account, as required by the original contract, Cross Chartering did not exercise its contractual right

to cancel the shipment.  (*See* Docket Entry No. 57, Ex. 2).  Instead, Thienpont/Cross Chartering again turned to Reynolds to resolve the problem.  (Docket Entry No. 58, Ex. A at 174–77).  Reynolds continued to assure Thienpont that he was going to work out the payment problem with ShawCor, while telling ShawCor — which reasonably believed that the payment sent to the R.I.P.C. account had met ShawCor's duties under the contract — that the shipment would proceed as scheduled.  Reynolds explained to Thienpont that "Bredero had erroneously paid the freight to [Reynolds's] account in Houston and not to [Cross Chartering's] account."  (*Id.* at 174).  Reynolds assured Thienpont that "he was going to make sure that the money was going to be transferred to [Cross Chartering's] account in Antwerp as soon as possible."  (*Id.* at 175).  At no point did Thienpont ever contact anyone at ShawCor to ask about the payment.

Based on this undisputed evidence, this court concludes that ShawCor reasonably believed that Reynolds had authority to act as Cross Chartering's agent and reasonably believed that Reynolds had Cross Chartering's authority to change the directions for sending the payment under the M/V K TOPAZ contract.  *Cf.* RESTATEMENT (SECOND) OF AGENCY §§ 27, 34–36, 49.  Based on this reasonable belief, the ShawCor parties complied with R.I.P.C.'s invoice directing that the second payment be wired to a bank account different from the account specified in the original contract.  Although the original contract stated that the terms were "fixed," the contract contained no merger clause.  Reynolds had apparent authority to direct ShawCor to send the funds to the bank account that in fact received the payment.  Cross Chartering's motion for summary judgment on the breach of contract claim

is denied.  ShawCor's motion for summary judgment that it complied with the contract payment obligations is granted.[5]

## V.     ShawCor's Counterclaims

ShawCor counterclaimed, alleging fraudulent inducement and aiding and abetting fraudulent inducement against Cross Chartering, R.I.P.C., A&R Shipping, and numerous individuals.  (Docket Entry No. 17 ¶¶ 79–80).[6]   ShawCor also alleged negligent misrepresentation.  (*Id.* at ¶ 83).   These claims were in effect raised as an alternative basis to preclude recovery by Cross Chartering from ShawCor.  Because ShawCor has prevailed on the contract claims, the counterclaims need not be addressed.

ShawCor also alleged conversion and conspiracy to commit conversion by all defendants, (Docket Entry No. 17 ¶¶ 85–87), as well as negligence and gross negligence based on a constructive trust theory.  (Docket Entry No. 17 ¶ 90).  All four alleged causes of action are predicated on a theory that the defendants caused the loss of the $501,664.00 payment Bredero Shaw LLP made to Reynolds for the M/V K TOPAZ shipment.  Because this court has granted ShawCor's motion for summary judgment on this claim, these causes of action, which assert an alternative theory for prevailing on Cross Chartering's M/V K TOPAZ breach of contract claim, need not be addressed.

---

[5] Because ShawCor prevails on this theory, this court need not address ShawCor's alternative claim for relief that by paying R.I.P.C., Cross Chartering's partner, ShawCor fulfilled its obligations under the contract.

[6] Third-party defendant Karin Reynolds has been voluntarily dismissed.  (Docket Entry No. 33).

ShawCor also alleged a civil RICO claim against Cross Chartering and R.I.P.C. (Docket Entry No. 17).  This court entered a default judgment against R.I.P.C.  (Docket Entry No. 61).  None of the remaining parties moved for summary judgment on this claim.

The Racketeer Influenced and Corrupt Organizations Act, Title IX of the Organized Crime Control Act of 1970 ("RICO"), 18 U.S.C. § 1962, imposes both criminal and civil liability on persons[7] engaging in a pattern of "racketeering activity connected to the acquisition, establishment, conduct or control of an enterprise."  *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996) (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988)).  "Racketeering activity" is defined as any act that could lead to criminal indictment under certain designated federal statutes.[8]  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989).  Mail fraud and wire fraud

---

[7]  The RICO statute defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961.

[8]  The RICO predicate crimes are listed in § 1961(1):
(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to

are both "predicate crimes" that may form the basis of RICO liability.  *See, e.g.*, *Brown v. Nationsbank Corp.*, 188 F.3d 579, 588 (5th Cir. 1999).  Under RICO, "an enterprise is a group of persons or entities associating for the common purpose of engaging in a course of conduct." *Whelan v. Westchester Prod. Co.*, 319 F.3d 225, 229 (5th Cir. 2003) (citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  The enterprise must consist of "an ongoing organization, formal or informal, [in which] various associates function as a continuing unit." *Id.*  The enterprise need not be a legally recognized such as a business, however, but may consist of any "union or group of individuals associated in fact."  18 U.S.C. § 1961(4).  To

---

fraud and misuse of visas, permits, and other documents), sections 1581-1591 (relating to peonage, slavery, and trafficking in persons), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons) , sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B).

prevail on a civil RICO claim, a claimant must show a violation of § 1962, injury to his business or property, and a causal connection between the damage and the violation of § 1962.

ShawCor has failed to allege or present facts that would show that Cross Chartering committed any of the predicate acts necessary for recovery under RICO.  Nothing in the record, including the testimony presented at the bench trial, supports an inference that Thienpont or Cross Chartering intentionally defrauded the ShawCor parties.  Although Cross Chartering and R.I.P.C. constituted an "enterprise," it did not engage in activity prohibited by RICO.  The evidence is that Reynolds acted alone in the fraudulent activities.  The civil RICO counterclaim against Cross Chartering is dismissed.

## VI.    Conclusion

ShawCor is not liable for breach of contract.  The counterclaims are dismissed.  The parties will bear their own costs and attorney's fees.  *Cf. Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 656 (5th Cir. 2004) ("According to the general 'American Rule' applied in admiralty cases, attorney fees are not awarded absent a statutory or contractual authority."); *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 406 (5th Cir. 2003) (holding that Texas law awarding attorneys' fees and costs to prevailing party in a contract dispute was not applicable to a maritime contract dispute).

The parties will submit a proposed final judgment, including resolution of the funds held in the court's registry (Docket Entry No. 42), to this court, no later than November 15, 2005.

SIGNED on November 2, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge